IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 7, 2013 Session

## SIDNEY PORTERFIELD v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P14675    Donald Paul Harris, Senior Judge**

---

**No. W2012-00753-CCA-R3-PD  - Filed June 20, 2013**

---

The petitioner, Sidney Porterfield, was convicted of first degree murder and sentenced to death. His conviction and sentence were affirmed on direct appeal. *See State v. Porterfield*, 746 S.W.2d 441 (Tenn. 1988). After his petition for post-conviction relief was denied, the petitioner filed a motion to reopen post-conviction proceedings, maintaining that he was intellectually disabled and thus ineligible to be sentenced to death. Following an evidentiary hearing, the post-conviction court denied the petitioner relief, and the petitioner appealed. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE JJ., joined.

Paul J. Bruno, Nashville, Tennessee, and Hershell D. Koger, Pulaski, Tennessee, for the appellant, Sidney Porterfield.

Robert E. Cooper, Jr., Attorney General & Reporter; James E. Gaylord, Assistant Attorney General; Amy P. Weirich, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The petitioner was convicted of first degree murder, and his co-defendant, Gaile K. Owens, was convicted of accessory before the fact, to wit: murder in the first degree for the death of Mrs. Owens' husband, Ronald Owens, in February of 1985. The evidence presented at trial that resulted in the petitioner's first degree murder conviction and the imposition of

the death penalty was summarized by the Tennessee Supreme Court in *Porterfield*, 746 S.W.2d at 444-45. In summary, Mrs. Owens offered to pay the petitioner to kill the victim. While Mrs. Owens and her children were away, the petitioner and the victim were involved in an altercation at the home of the victim and Mrs. Owens. The petitioner struck the victim on the head numerous times with a tire iron, killing him. The petitioner gave a statement to the police in which he admitted killing the victim. The Tennessee Supreme Court affirmed the petitioner's conviction and death sentence on direct appeal. *See Porterfield*, 746 S.W.2d at 441-42.

## POST-CONVICTION PROCEEDINGS

The petitioner subsequently sought post-conviction relief alleging ineffective assistance of counsel. The post-conviction court denied relief, and the Tennessee Supreme Court affirmed the post-conviction court's judgment on appeal. *See Porterfield v. State*, 897 S.W.2d 672, 679 (Tenn. 1995). On April 20, 1995, the petitioner filed a second petition for post-conviction relief. The post-conviction court dismissed the petition as untimely, and this court affirmed the dismissal on appeal. *See Sidney Porterfield v. State*, No. 02-C-01-9611-CR-00388, 1997 Tenn. Crim. App. LEXIS 323, at **1-2 (Tenn. Crim. App., at Jackson, Apr. 2, 1997).

On December 2, 2012, the petitioner filed a motion to reopen his post-conviction relief petition pursuant to Tennessee Code Annotated section 40-30-217. In his motion, the petitioner alleged that he was intellectually disabled and, therefore, ineligible for the death penalty pursuant to *State v. Van Tran*, 66 S.W.3d 790 (Tenn. 2001). The petitioner also challenged the validity of the indictment in light of the United States Supreme Court's decisions in *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and the propriety of the selection of the grand jury.

In support of his claim of intellectual disability, the petitioner attached to his motion the affidavit of Dr. Edward J. Cozza. Dr. Cozza is a licensed school psychologist in Ohio who also specializes in the diagnosis and treatment of those with intellectual disability and learning disabilities. Dr. Cozza reviewed the petitioner's records of I.Q. testing in 1955, 1968, and 1981.

According to Dr. Cozza's affidavit, the petitioner was administered the Stanford Achievement Test by his school on February 28, 1955, when the petitioner was twelve years old. The results of the test indicated that the petitioner had a mental age of 3.8, which Dr. Cozza stated supported the conclusion of generalized sub-average cognitive functioning. On August 29, 1955, the petitioner was administered the Lorge Thorndyke I.Q. test, which resulted in an I.Q. score of 67. Dr. Cozza stated that this I.Q. score represented a substantial

cognitive impairment and fell within the mildly intellectually disabled range.

In 1968, while in prison, the petitioner was administered the Beta I.Q. test and received an I.Q. score of 73. Dr. Cozza was not familiar with this test. He stated that the score represented a performance level of approximately two standard deviations below the average, assuming a commonly used mean of 100 and a standard deviation of fifteen points. He also stated that this score was consistent with the classification of mild intellectual disability.

On September 23, 1981, the petitioner was administered the Wechsler Adult Intelligence Scale (WAIS), the California Achievement Test (CAT), and the General Aptitude Test Battery (GATB). The petitioner's grade equivalent scores on the CAT were 8.3 for reading, 4.7 for arithmetic, and 2.6 for language. Dr. Cozza said that the petitioner's scores were consistent with the petitioner's other cognitive test results and appeared to be valid and reliable scores. According to Dr. Cozza, the language score of 2.6 was severely low, suggesting either a language disorder or language-based intellectual disability. On the GATB, the petitioner received a verbal score of 76, a non-verbal score of 69, and a global I.Q. score of 70.

On the WAIS, the petitioner received an I.Q. score of 91, which fell within the lower end of the average range. Dr. Cozza stated, however, that the test was not properly or completely administered to the petitioner. Dr. Cozza explained that the WAIS was designed to measure verbal and performance abilities with a minimum of ten different subtests, the results of which yield a full-scale I.Q. score. The petitioner was administered only two verbal tests and two performance tests. Dr. Cozza stated that from this limited sample, it was impossible to compute a valid full-scale I.Q. score. He also stated that in light of the petitioner's language deficits, he doubted that the petitioner would have scored in the average range on the verbal comprehension portion of the WAIS.

Dr. Cozza concluded that the petitioner had a history of developmental cognitive impairment that was consistent with a classification of mild intellectual disability, with onset before the age of eighteen. Dr. Cozza further concluded that the petitioner had substantial academic deficits that placed his mental age and achievement levels several years behind his age.

The post-conviction court summarily dismissed the petitioner's motion to reopen. The petitioner filed an application for permission to appeal in this court. This court concluded that the trial court erred in summarily dismissing the petitioner's claim regarding his alleged intellectual disability and remanded, in part, the motion to reopen for a hearing pursuant to *State v. Van Tran*. This court denied the petitioner's application for permission to appeal as

to the remaining two issues.

## EVIDENTIARY HEARING

The petitioner presented the testimony of Dr. Joseph Angelillo, a clinical and forensic psychologist. The post-conviction court admitted Dr. Angelillo as an expert in forensic psychology. Dr. Angelillo testified that he evaluated the petitioner to determine whether he was intellectually disabled at the time of the offense. Dr. Angelillo conducted a clinical interview of the petitioner during which he obtained a history of the petitioner's family and education. He also administered a series of tests to the petitioner.

Dr. Angelillo testified that he examined the petitioner's school records and noted that he failed the second and fifth grades and failed the seventh grade twice. Dr. Angelillo said that the further that the petitioner progressed in school, the worse that he performed. According to the school records, the petitioner was administered the Standford Achievement Test on February 28, 1955, when he was twelve years old. The results indicated a grade level of 3.8. Dr. Angelillo noted that a twelve-year-old who progressed normally through school would be in the sixth or seventh grade. On August 29, 1955, the petitioner was administered the Lorge Thorndike, an intelligence test, and received an I.Q. score of 67.

Dr. Angelillo examined a report from the petitioner's prior incarceration in 1965. According to the report, the petitioner stated that he had a ninth grade education. The petitioner reported prior employment as a sheer mechanic, a cook, and a laborer. These jobs were not verified by the person who prepared the report. The report also listed a number of arrests.

Dr. Angelillo said the report noted that the petitioner had taken the Beta I.Q. test and received a score of 73. Dr. Angelillo conducted research regarding the Beta test because he did not use the test in his evaluations and did not know any other psychologist who used it. He said the test was developed by a psychologist for screening during World War II. The test included an Alpha section, which tested verbal skills, and a Beta section, which tested nonverbal skills. Dr. Angelillo said the report from the petitioner's incarceration in 1965 noted that the petitioner had not served in the military. The petitioner registered for selective service and was classified in 4-F. The report also noted, "We believe subject to have inferior intelligence and inadequate. Prognosis for rehabilitation is guarded.

Dr. Angelillo considered a report from a correctional facility related to the petitioner's criminal conviction in 1967. The report noted that the petitioner reported a tenth grade education but that his education was not verified. The petitioner stated he completed the tenth grade while attending night school following his release from prison in 1966. Based

-4-

upon the petitioner's birth date of February 28, 1943, he would have attended the tenth grade at the age of twenty-three.

The report listed the petitioner's prior employment as a forklift operator, which he held for approximately four months from November 1966 to March 1967, and an assembly line worker, which he held for approximately two months. The report noted that the petitioner held both jobs at the same time. The report also noted the petitioner's criminal history, including a number of criminal convictions received during a time period running from 1963 through 1967. The report stated, "We find subject to have inferior intelligence. Prognosis for prison and civil adjustment is poor."

Dr. Angelillo testified that the petitioner was administered the WAIS on October 22, 1981. Only four subtests of the at least ten subtests required were administered to the petitioner. The petitioner received an I.Q. score of 91. Dr. Angelillo said this score was not valid because the WAIS was not designed to be administered in part and was useless when only portions of the test were given.

The same report noted that the petitioner was administered the CAT on the same date. Dr. Angelillo testified that he was not familiar with the test but believed it was an I.Q. test of general aptitude that measured skills according to grade equivalents. The petitioner would have been approximately thirty-eight years old at the time of testing. According to the report, the petitioner tested at approximately the eighth grade level in reading, between the fourth and fifth grade levels in arithmetic, and between the second and third grade levels in language. The petitioner's average grade level was the fifth grade. The report also referenced results from the GATB, an I.Q. test used to assist in predicting success in certain areas of work. The petitioner received an overall score of 70. Dr. Angelillo stated he was unsure whether the GATB was administered to the petitioner as an I.Q. test.

Dr. Angelillo testified that he met with the petitioner on September 9th and 10th, 2010, at Riverbend Maximum Security Institution in Nashville. Dr. Angelillo administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"), an intelligence test, to the petitioner. The petitioner received a full-scale I.Q. score of 77. At the time, the petitioner was sixty-seven years and six months old. Dr. Angelillo was aware that on October 25, 2011, Dr. Tucker Johnson administered the WAIS-IV to the petitioner and that the petitioner received a full-scale I.Q. score of 71.

Dr. Angelillo also administered the nonverbal portion of the Test of Memory Malingering. The test included two trials, and a score of 45 or below out of 50 possible points in either trial indicated a suspicion of malingering. The petitioner received a score of 47 on the first trial and 50 on the second trial. Dr. Angelillo said that according to the criteria

provided in the test manual, the results showed that the petitioner was giving his best efforts on the testing.

Dr. Angelillo administered a portion of the Wide Range Assessment of Memory and Learning. He explained that he wished to obtain another measure of the petitioner's memory, both verbally and nonverbally. The petitioner received a verbal score of 80 and an attention concentration score of 85.

Dr. Angelillo also administered two subtests of the Woodcock-Johnson, an achievement test that measures the age or grade equivalent of a person's learning level. In the Letter Word Identification Subtest, a test in which the petitioner was asked to read a list of words, the petitioner performed at a grade level of 7.1 and an age level of 12.9. Dr. Angelillo said he used the results of the test to gather data on the petitioner. In the Passage Comprehension Subtest, the petitioner was presented with a booklet with short paragraphs. Dr. Angelillo asked the petitioner to read the information to himself and state one word that best completed or showed the meaning of the paragraph. The petitioner performed at a grade level of 7.7 and an age level of twelve years and eight months.

Dr. Angelillo testified that the petitioner's functional intelligence or functional I.Q. at the time that he committed the offenses was lower than 70. In reaching his opinion, Dr. Angelillo applied the standard error of measurement, which he said generally is plus or minus five points. Dr. Angelillo also applied the Flynn Effect, which adjusts I.Q. scores based upon the premise that people become more intelligent over time. He explained that an adjustment is made for the difference in time between when the test was standardized and when the test was administered to the subject at an amount equal to .3 or .31 points per year. Dr. Angelillo said the WAIS-IV was standardized in 2007 or 2008 and was published in 2008. Applying the Flynn Effect to the three years between when the WAIS-IV was standardized in 2007 and when the test was administered to the petitioner in 2010 resulted in a score reduction of approximately one point. Dr. Angelillo, however, explained that he was asked to render an opinion as to the petitioner's intellectual functioning in 1985 or 1986. In doing so, he also considered the petitioner's score from the Lorge Thorndike test administered to him in 1955 because it was the only I.Q. test administered to the petitioner during that time period. Dr. Angelillo acknowledged that he would not administer the Lorge Thorndike test today. He noted that both the petitioner's grades in school and his I.Q. score on the Lorge Thorndike test were very low. Dr. Angelillo said his analysis and opinion would be the same using the petitioner's score from the WAIS-IV administered by Dr. Johnson.

Dr. Angelillo testified to the difficulty in rendering an opinion regarding whether the petitioner had any deficits in adaptive behavior at the time of the offense due to the amount of time that had passed since the offense occurred. He said that such a determination

required that he examine information in hindsight from twenty-five to twenty-six years ago. Dr. Angelillo did not have anyone at his disposal who could recall being with the petitioner in 1985 or 1986. He stated that even if such a person were available, it would be difficult to assume that the person's recollection would be a valid indicator of the petitioner's functioning at that time. Rather, Dr. Angelillo relied upon the records that he was provided, including school records, to determine whether the petitioner had any adaptive deficits at the time of the offense. He acknowledged that "there is no way [he could] say that this is certainly based on rock solid information."

Dr. Angelillo considered the deficits listed by the American Association of Intellectual and Developmental Disabilities (AAIDD). He concluded that the petitioner had adaptive deficits in the social category. The AAIDD described the social category as the ability to follow the law and rules and the ability to act in a way to benefit both yourself and society. Dr. Angelillo said that "my opinion is that at that time I didn't see that there was a lot to argue against it." He also said the petitioner's functioning while incarcerated during the past several years had little relationship to how he would function in the outside world.

Dr. Angelillo testified that the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) listed ten or eleven adaptive deficits and that two adaptive deficits were required to meet the criteria for intellectual disability. Dr. Angelillo found that the petitioner had adaptive deficits in the social category of the DSM-IV based upon the same information that he used in determining that the petitioner had adaptive deficits in the social category in the AAIDD. Dr. Angelillo also found that the petitioner had adaptive deficits in the work category of the DSM-IV. Dr. Angelillo noted the difficulty in evaluating the petitioner's work deficits based upon the existence of conflicting reports. According to the petitioner's social security records, the petitioner earned approximately $13,000 over twenty years, but Dr. Angelillo did not know how many of those years that the petitioner was incarcerated. According to other records, the petitioner had a job at one time earning $21,000 a year. Dr. Angelillo noted that the jobs that the petitioner held earned low pay, were relatively simplistic or did not require a great deal of qualifications, and only lasted five to six months. Dr. Angelillo also noted that a determination of functional deficits regarding work required a comparison of the petitioner's peer group in the community in which he was raised. He explained, "And again, I wasn't there[,] so therefore I can't give an observation based on that. However, that even–that taken into consideration, I believe he would qualify for a problem [in] adaptability with regard to work."

Dr. Angelillo testified that the DSM-IV listed in function academic skills as a category of adaptive deficits. He said any opinion regarding whether the petitioner had problems in this category was based upon "[s]peculation." Dr. Angelillo noted the petitioner's scores on achievement tests were low. However, he was unaware of whether the petitioner could

complete tasks such as making change or writing a check. Dr. Angelillo said that although he could speculate as to whether the petitioner could have completed these tasks, he believed that to do so was "a little bit risky."

Dr. Angelillo testified that the onset of the petitioner's intellectual disability occurred before the age of eighteen. He explained that his opinion was not required to be diagnostic. Rather, some information must be available showing a presence of problems. Dr. Angelillo said the strongest data supporting his opinion were the petitioner's very low grades in school. He also noted the petitioner's scores on the Lorge Thorndike I.Q. test and the achievement test given while the petitioner was in school.

Dr. Angelillo testified that in his field, it was appropriate to consider information obtained after the subject reached the age of eighteen to determine whether the onset of intellectual disability occurred before the age of eighteen. Dr. Angelillo noted that the petitioner continued to have lower scores on I.Q. tests after he reached the age of eighteen. Moreover, his opinion that the petitioner had deficits in the social and work categories was based upon events that occurred after the petitioner reached the age of eighteen. He also considered the petitioner's school records. Dr. Angelillo concluded that the petitioner was intellectually disabled as defined by the DSM-IV and the AAIDD before reaching the age of eighteen and at the time that the offense was committed.

On cross-examination, Dr. Angelillo testified that the WAIS-IV was one of the most highly regarded I.Q. tests. He said that the petitioner's I.Q. score of 77 indicated a 95% competence interval and that his actual I.Q. score was within plus or minus five points of the score of 77. He acknowledged that the deviation did not require that five points be subtracted from the I.Q. score.

Dr. Angelillo testified to the difficulty in attempting to determine a person's functioning level twenty or thirty years ago. He did not administer adaptive tests to the petitioner to determine his adaptive ability. He also did not interview any of the personnel at the prison where the petitioner was incarcerated. Dr. Angelillo questioned the petitioner regarding his life and work history. The petitioner held a number of jobs, and many of those jobs ended whenever the petitioner was arrested and incarcerated.

Dr. Angelillo believed the petitioner performed poorly in the social area of adaptive functioning based upon his inability to follow the law. Dr. Angelillo noted the petitioner also tended to be dependent, follow others, and not be a leader. The petitioner began committing crimes when he was young. Dr. Angelillo recalled that the petitioner had multiple arrests for larceny and one prior arrest for forgery, during which he admitted to forging 180 checks.

Dr. Angelillo testified that he concluded that the petitioner was intellectually disabled based upon his I.Q. score of 77 on the WAIS-IV, the petitioner's education reports (which consisted of one page), reports from prison intake, and the results of the Lorge Thorndike test that was administered when the petitioner was in school. Dr. Angelillo acknowledged that he only applied the Flynn Effect in capital cases. He did not apply the Flynn Effect in assessing patients for intellectual disability in areas other than in capital litigation. Dr. Angelillo was unaware that the American Psychological Association and the AAIDD did not apply the Flynn Effect.

On redirect examination, Dr. Angelillo testified that he formed his opinion before he learned that the petitioner had received an I.Q. score of 71 on the WAIS-IV administered by Dr. Johnson. He said that even when he considered the I.Q. score, he reached the same conclusion.

Dr. Angelillo testified that in conducting assessments in areas outside of capital litigation, he only determined the person's I.Q. score. In those situations, he did not determine whether the person was intellectually disabled because he did not have sufficient information to render an opinion regarding the other two prongs. Dr. Angelillo said capital litigation was the only area in which he conducted evaluations in which a specific I.Q. number was relevant. He noted an article published in 2010 addressing the assessment of intellectual disability in capital cases had concluded that the Flynn Effect had received sufficient recognition and acceptance and ought to be used in capital cases. On recross examination, Dr. Angelillo testified that if he did not apply the Flynn Effect but applied the standard deviation, the petitioner's I.Q. would be between 82 and 72.

The State presented Dr. Tucker Johnson, a consulting psychologist with the Department of Intellectual and Developmental Disabilities, as an expert in forensic psychology. Dr. Johnson testified that she evaluated the petitioner on October 25, 2011, at Riverbend Maximum Security Institution. She obtained a social history from the petitioner and interviewed him regarding specific adaptive functioning areas. Dr. Johnson reviewed the petitioner's records from his current incarceration from 1986 to 2011 and Dr. Cozza's affidavit. Dr. Johnson did not have any direct records of the petitioner's past achievement testing other than Dr. Cozza's affidavit.

Dr. Johnson testified that she interviewed several people at the prison in an attempt to obtain information regarding the petitioner's functioning in prison, including his work performance, his functioning with other inmates, and his ability to follow rules. Dr. Johnson specifically examined whether the petitioner appeared vulnerable to influence by more sophisticated inmates. She explained that such vulnerability often was a characteristic of those in prison with intellectual disability.

Dr. Johnson interviewed the petitioner in a room in the facility's infirmary. The room was very large and generally quiet. Some distractions occurred at times, including loud noises and yelling. At one point, someone was knocking on the other side of the wall.

Dr. Johnson testified that she asked the petitioner whether he knew that she was coming and what she was there to do. The petitioner confirmed that he knew. Dr. Johnson gave the petitioner a "forensic warning" by reviewing with him the purpose of the evaluation and the results. She told him that the evaluation was relevant to the post-conviction proceedings that addressed his cognitive function and his eligibility for the death penalty. Dr. Johnson informed the petitioner that her results were not confidential and would be relayed to the judge and the attorneys in a written report, during oral testimony, or both.

Dr. Johnson interviewed the petitioner regarding his background and attempted to obtain a rapport. She said the petitioner seemed reserved at first. As time passed, he seemed to settle in and was very responsive. Dr. Johnson said the petitioner answered every question and seemed to be fairly forthcoming. Dr. Johnson stated that the petitioner was very pleasant during the interview and seemed to be cooperative.

Before Dr. Johnson left, an officer entered the room. The petitioner initiated a conversation with him, and they had a pleasant discussion. Dr. Johnson said someone who is intellectually disabled often has communication deficits. She described the conversation between the officer and the petitioner as casual and appropriate and said that the discussion included normal conversational reciprocal interaction. The petitioner seemed to respond well to the nonverbal and verbal cues that the officer gave him.

Dr. Johnson testified that the petitioner stated that he was born in Shelby County and lived in Shelby County or north of Memphis during his childhood. The petitioner was the oldest of eleven children and was raised by both parents. The petitioner told Dr. Johnson that he had never been married. Dr. Johnson understood that according to some reports, the petitioner previously had stated that he had been married, but he later redacted that claim. The petitioner reported that he had two children, one of whom was still alive.

The petitioner reported that he quit school in 1960 when he was seventeen years old and in the eighth grade. The petitioner said it was likely that he was held back in some grades. Dr. Johnson said the petitioner's school records appeared consistent with his claims. Dr. Johnson asked the petitioner how his grades were in school, and the petitioner relied, "They were mediocre." The petitioner said that he had never been suspended or expelled but that he occasionally skipped classes. He also said he left school to earn money.

The petitioner reported obtaining a GED in 1970 while incarcerated. The

reclassification needs assessment forms from Riverbend dated 1994 to 1998 stated that the petitioner fell into the classification of inmates who had either a GED or a high school diploma. The petitioner stated that he also received preliminary training in air conditioning and refrigeration while obtaining his GED.

The petitioner reported having a variety of jobs while he was not incarcerated. Most of the jobs were short-term. The longest that the petitioner held a job at one location was as a bartender and a cook. The petitioner had been self-employed in the areas of air conditioning and refrigeration repair. He also had worked as an automobile mechanic. The petitioner said that when he was released from a prison on a prior conviction, he attended William R. Moore School of Technology for one and one-half years where he obtained additional training in air conditioning and refrigeration repair. He also said he was self-employed from 1978 to 1985. The petitioner described how he ran his business, how he scheduled appointments, the tasks that he completed, and the measurements that he had to take. Dr. Johnson said that at one point in the petitioner's life, he seemed to have attempted to engage in a prosocial lifestyle.

Dr. Johnson testified that in determining a person's adaptive skills, she examined how the person functioned in the employment area. She stated that while many of the short-term jobs that the petitioner held appeared to be "pretty low[-]skilled," she believed the petitioner had to have some organizational ability to maintain an air conditioning and refrigeration business. Dr. Johnson questioned the petitioner regarding specific tasks that he had to complete. She acknowledged that she did not have other sources available to confirm the information related to her by the petitioner. She said the petitioner appeared to have operated on a "cash only basis." During the first few months in which he operated his business, he had a bank account. The petitioner reported that while bartending, he had to mix drinks, which Dr. Johnson stated required some memory skills.

The petitioner reported to Dr. Johnson that he obtained his driver's license at the age of twenty-six and that he did not need a license before then. The petitioner said he had to drive to different appointments in Memphis for his business and used a city map to find his way around the area. He also said he believed that maps now were "obsolete." The petitioner reported that he did not have any problems ordering from a menu. Dr. Johnson examined samples of the petitioner's writing that showed that "he might not be the best writer in the world, but that he has some command of the English language."

The petitioner told Dr. Johnson that at the age of fifteen, he left home to live with a maternal uncle. He said that during his lifetime outside of prison, he usually had lived alone but lived with relatives on occasion. Dr. Johnson said the petitioner lived independently in the community for a substantial amount of time and had been doing so when he was arrested

-11-

for the current offense.

Dr. Johnson discussed basic hygiene with the petitioner, and she was assured by prison personnel that the petitioner's hygiene was excellent. Dr. Johnson asked the petitioner how he would find a restroom in the community that he could use, and the petitioner replied that he would look for signs and whether it was male or female. The petitioner was able to spell both "male" and "female." The petitioner said he would wash his hands after using the restroom.

The petitioner told Dr. Johnson that he knew how to use a telephone directory to find a telephone number. Dr. Johnson testified that the petitioner was able to add and subtract fairly well but experienced problems subtracting $.73 from $1.00. The petitioner concluded that $1.00 minus $.73 equals $.37. The petitioner informed Dr. Johnson that his paycheck was deposited once per month into his account. When Dr. Johnson asked the petitioner how he ensured that he had money to last him through the month, the petitioner replied, "I prioritize."

Dr. Johnson testified that while the petitioner discussed his criminal history, she did not question him in detail about it. She also interviewed the petitioner regarding his work history in prison. The petitioner stated that he had worked in data processing at the prison for approximately twelve to thirteen years. He also stated that the job involved entering data into the computer, and Dr. Johnson confirmed this information during her interview with the inmate job coordinator at the prison. At the time of the evaluation, the petitioner was in a commercial cleaner position performing janitorial tasks. The petitioner's current supervisor had been supervising the petitioner for only five years and had not supervised the petitioner while he was working in the data processing area full time. The supervisor informed Dr. Johnson that she believed that the petitioner was moved to the commercial cleaner position because his error rate in data processing had been high. Dr. Johnson stated that according to the petitioner's work performance reviews in his prison file, however, his performance in data processing varied from satisfactory and acceptable to excellent and exemplary. The petitioner's supervisor told Dr. Johnson that the petitioner continued to be used in the data processing area from time to time. The supervisor also reported that the petitioner was very independent in performing his cleaning tasks, did not require prompting, and his performance was "very good."

Dr. Johnson reviewed prison records that established that the petitioner was approved to be a volunteer inmate legal advisor to other inmates. In 2000, the petitioner applied to be a legal advisor and was approved by the warden to take a test to become a legal advisor. Records from 2001 stated that he had been approved. Dr. Johnson was unable to locate the test that the petitioner took. The petitioner told Dr. Johnson that the test involved different

legal terms such as "habeas corpus." The petitioner was a legal advisor for seven to eight years but assisted only a few inmates. The petitioner stated that the job was not difficult but was time consuming. He since had become engaged in his own legal work. The petitioner also reported being the institutional barber at one time.

The petitioner discussed keeping score when he played games such as dominos, handball, and basketball with other inmates. The petitioner reported to Dr. Johnson that he exercised in the recreation yard daily. Dr. Johnson confirmed the petitioner's statement with the inmate relations coordinator and the correctional supervisor of the unit. Dr. Johnson acknowledged that a person's functioning in prison is not necessarily indicative of his or her functioning in the community. She explained, however, that information regarding the petitioner's leisure skills suggested that he had the capacity to engage in them on a regular planned basis.

The petitioner told Dr. Johnson the number of years that he had been incarcerated at Riverbend and the date on which his incarceration began. Dr. Johnson said the petitioner "seemed to have some minor difficulties with number concepts, but basically they were okay." The petitioner was able to state the correct time from an analog watch. The petitioner named the days of the week in order, wrote down the current day of the week, and spelled "Tuesday" correctly. He also knew that there are sixty seconds in one minute.

Dr. Johnson testified that the petitioner appeared to be able to use words with four to six syllables accurately. The petitioner stated that he did not have friends in prison but claimed that he did have "associates." When Dr. Johnson asked him how he decided who would be an "associate," the petitioner replied, "Compatibility." Dr. Johnson said that those with intellectual disability often use a large word without knowing the word's meaning. Dr. Johnson asked the petitioner the meaning of "compatibility," and the petitioner replied, "That means whether we have some interests in common like doing legal work or playing basketball or handball." Dr. Johnson said the petitioner correctly used the words "obsolete," "mediocre," "eradicate," "inquiry," "forbidden," "irrelevant," and "malfunctioning." Dr. Johnson tested the petitioner for use of irregular plurals. The petitioner was able to give her the plural of both "mouse" and "knife." He incorrectly stated that the plural of "deer" was "deers."

The petitioner reported to Dr. Johnson that for pleasure, he read newspapers, magazines, and books. He read books primarily about history. Dr. Johnson questioned the petitioner regarding current events in the world and any current event that was in the news on the day of the interview. The petitioner told her about "the killing of Gaddafi" who he said was a dictator in Libya. The petitioner said he had heard that "Gaddafi" was kept in a cooler for everyone to view but that he would be buried in a secret burial.

-13-

When Dr. Johnson questioned the petitioner regarding the actions that he would take if he cut his finger, the petitioner said he would clean the cut and put a "Band-Aid" on it. He also said that if he was unable to stop the bleeding, he would seek help. The petitioner discussed losing part of his thumb in an occupational accident and said that he went to the hospital for treatment. The petitioner reported that the only medication that he had ever taken was aspirin for headaches and an antibiotic following the occupational accident.

The petitioner discussed with Dr. Johnson his efforts to keep his living area clean and the items that he used to clean the area. He said that in the past, he had cleaned his clothes by either using a washer and dryer or by taking them to the dry cleaner. The petitioner reported that he had cooked using recipes in the past and that he had enjoyed baking cakes. He knew that he needed to eat plenty of fruits and vegetables. He said that he was trying to avoid eating meat when possible due to its cholesterol but that he was not always successful given the food served in the prison.

The petitioner told Dr. Johnson that when he was not incarcerated, his surviving daughter visited him in his home. He watched cartoons with her on Saturdays and took her to places such as the park, the zoo, and the movies. Dr. Johnson testified that she questioned the petitioner regarding these activities to determine whether he had a social understanding of his daughter's needs and the activities that she would enjoy. Dr. Johnson explained that those who are intellectually disabled generally do not understand the point of view of others or have very concrete points of view. The petitioner said he had prepared meals for his daughter. When they crossed the street, the petitioner held her in his arms when she was young or held her hand to ensure that she was safe. The petitioner also said that he and his daughter now correspond through letters and that he sends her money every year for her birthday.

Dr. Johnson asked the petitioner whether he had taken any special precautions when his daughter had visited. The petitioner said he locked up the items that he used to clean his drains and various soaps. He also said, "I didn't have to worry about medications because I didn't have any, but I kept those things locked when she visited."

Dr. Johnson asked the petitioner how to detect if he had hurt a person's feelings, and the petitioner said that he would know if the person frowned or showed that he or she was upset. Dr. Johnson testified that the petitioner was "a little limited" on his ability to describe emotions. The petitioner said that he would apologize if he hurt the feelings of someone important to him.

Dr. Johnson questioned the petitioner regarding emergency and safety. The petitioner knew to call 9-1-1 in case of emergency. Dr. Johnson wrote down different words and asked

the petitioner to read them and tell her their meaning. She wrote down the word "danger" and asked the petitioner what he would do if he saw a sign stating the word. The petitioner replied, "Avoid it." Dr. Johnson wrote down the phrase "do not enter" and asked the petitioner to read it, which he did correctly. She asked the petitioner, "If you saw those on a sign, what would that mean?" The petitioner stated, "It would mean you are forbidden to enter." Dr. Johnson wrote down the word "exit." The petitioner read it and said, "That's the way out."

Dr. Johnson asked the petitioner what he would do if he smelled natural gas. The petitioner stated that it had been some time since he had been around natural gas. He said that he had smelled it previously, but he believed that an "egg smell" had been added to it since then. Dr. Johnson explained that the petitioner's statement showed that he was maintaining some familiarity with events that had occurred beyond the prison since his incarceration. The petitioner told Dr. Johnson that if he smelled gas in his home, he would attempt to locate the source. The petitioner acknowledged that other people likely would not attempt this. Dr. Johnson asked the petitioner what actions he should or should not take in attempting to locate the source of the gas. The petitioner stated, "Well, you shouldn't light a match or flip a light."

Dr. Johnson asked the petitioner what a person should do if a tornado is sighted nearby. The petitioner said, "Go to the lowest point you can find in your home." He also said he had never heard a tornado siren.

Dr. Johnson questioned the petitioner regarding what steps a person should take to ensure that the person is safe while driving a car. The petitioner said, "Be highly observant. Make sure all your windows are clean and your signals work." He acknowledged that he had never worn a seat belt. He said that although he had owned a car that would not start unless he was wearing a seat belt, he had disabled that function on the car. When Dr. Johnson asked the petitioner what he did to keep his car in good working order, he replied, "I did preventative maintenance like tuning it up, changing the tires, changing the spark plugs, changing the oil, adjusting the carburetor."

Dr. Johnson testified that intellectual disability is presumed to be a lifelong condition. She said that the functioning of those with intellectual disability could improve "slightly to somewhat" if they were placed in supportive and structured environments. Noting that the prison environment was limited and structured, Dr. Johnson predicted that any person who was intellectually disabled could function well within a prison if the person was not preyed upon by other inmates. Dr. Johnson examined the petitioner's current functioning and attempted to project backwards from what she knew about his history and his current functioning. She said that while the petitioner had some problems with data entry, he was

continuing to be used in data entry, and, therefore, he must not have had a significant error rate.

Dr. Johnson did not have any direct reports of the petitioner's prior testing. The petitioner's earliest testing was reported by Dr. Cozza in his affidavit. The petitioner received an I.Q. score of 67 on the Lorge Thorndike test and a mental age of 3.8 years on the Standford Achievement Test. In 1968, he received an I.Q. score of 73 on the Beta test. In 1981, the petitioner received an I.Q. score on the GATB and was administered the CAT.

Dr. Johnson also reviewed testing information from Riverbed. In 1986, soon after the petitioner was incarcerated for the current conviction, the petitioner was administered the Peabody Picture Vocabulary Test, which Dr. Johnson said often is used as an I.Q. screening test. The petitioner received an I.Q. score of 94, which fell within the average range. He received a grade equivalent score of 6.2 on the reading section, which tests recognition and articulation of words. The report stated that the petitioner was functioning within the average learner's range of intellectual ability.

Dr. Johnson expressed concern regarding the validity of the petitioner's I.Q. score of 67 on the Lorge Thorndike test and his mental age score of 3.8 on the Stanford Achievement Test which were administered by school personnel when the petitioner was twelve years old. Dr. Johnson described the Lorge Thorndike test as a group-administered I.Q. test where each student receives a piece of paper and is asked to complete the test. By using this group setting the Lorge Thorndike test differed from an individually-administered I.Q. test, where the examiner had the ability monitor the test-taker's degree of cooperation and look for boredom, distractions, or an inability to maintain motivation. Dr. Johnson testified that the DSM-IV states that the diagnosis of intellectual disability must be based upon an individually administered intelligence test. She said that because the petitioner lacked motivation in his school work, she did not believe that he was motivated to try his best on both tests. Dr. Johnson also stated that "[while she] wasn't there . . . that [wa]s an assumption [she] felt that [she] could make pretty clearly because [the petitioner] had told [her] he had not been very interested in school at all."

Dr. Johnson noted that in 1968, at the age of twenty-five, the petitioner received an I.Q. score of 73 on the Beta test. At the time that Dr. Johnson earned her doctoral degree, the Beta test had been adapted for mass use in elementary schools. The test was a short screening test and was not an individually administered I.Q. test. As a result, Dr. Johnson believed that the reliability of the petitioner's I.Q. score on the test was limited.

Dr. Johnson testified that she had not seen the GATB. In researching the test, she learned that it was designed by the United States Education Service in the 1940s to test a

person's abilities for purposes of vocational counseling and occupational selection. Dr. Johnson was not sure how the petitioner's results on the test could equate to an I.Q. score.

The petitioner also was administered four subtests of the WAIS. Dr. Johnson agreed with Dr. Angelillo's testimony that a full-scale I.Q. score could not be obtained from four subtests. Dr. Johnson noted that the petitioner received a score within the average range on the Peabody Picture Vocabulary Test, an individually administered test. Dr. Johnson said the petitioner's higher score on this test suggested that the petitioner's motivation during prior testing had fluctuated. She explained that a person could easily score lower on an I.Q. test than the person's actual intellectual functioning but that it was difficult for a person to score substantially higher on an I.Q. test than the person's actual intellectual functioning.

Dr. Johnson administered to the petitioner the WAIS-IV, a widely recognized, standardized, fully normed, and individually administered I.Q. test. The petitioner received a full-scale I.Q. score of 71, which fell within the borderline range of intelligence. The petitioner's verbal reasoning abilities fell within the low average range with a composite score of 80. His nonverbal reasoning abilities were in the borderline range with a composite score of 73. The petitioner's ability to process simple or routine visual material without making errors fell within the low average range with a composite score of 81. The petitioner's only composite score that fell below 70 was his working memory or his ability to sustain attention, concentrate, and exert mental control.

Dr. Johnson also administered the TOMM to the petitioner to determine whether he was malingering. The petitioner received a perfect score on the first trial, and as a result, Dr. Johnson did not administer the second trial. Dr. Johnson said that according to the score, the petitioner was exhibiting adequate effort. She believed that the petitioner was not as motivated to do well on the testing that she administered as he had been on the testing administered by Dr. Angelillo, but she said, "But again, that's an assumption on my part."

Dr. Johnson said that she administered the Adaptive Behavior Assessment System, Second Edition, Adult Form (ABAS-II) to obtain information on how the petitioner viewed his own adaptive functioning. Dr. Johnson explained that the ABAS-II was based upon the area of adaptive skills listed in the AAIDD. The ABAS-II provided an adaptive skill conceptual composite, an adaptive skill social composite, an adaptive skill practical composite, and a general adaptive composite or overall functioning. The petitioner rated himself in the average range in all areas and did not present himself as having superior skills. Dr. Johnson said that the petitioner's own ratings appeared to be consistent with the conclusions that she had reached after questioning him. Dr. Johnson stated that according to research regarding the ABAS-II, the correlation between an individual's rating of himself and other's ratings of that individual is .93, which she described as a "pretty high"

correlation. Dr. Johnson considered the results from the ABAS-II along with the information that she obtained from her interviews regarding the petitioner's specific adaptive skills.

Dr. Johnson concluded that the petitioner's intellectual functioning was within the borderline range and that the petitioner was not intellectually disabled. Dr. Johnson said she did not know that the petitioner received an I.Q. score of 77 on a test administered by Dr. Angelillo until Dr. Angelillo testified. She stated, however, that the I.Q. score of 77 was consistent with her conclusion.

Dr. Johnson testified that the issue of the application of the "Flynn Effect" had been raised in a number of cases. She explained that insufficient information regarding the "Flynn Effect" was known in order to apply it. Rather, she stated that the "accepted practice within the field of psychology is that your best estimate of a person's true I.Q.–which can never be known, only measured–is a current I.Q. score that's obtained on a properly administered, current, recently normed I.Q. test that's individually administered." Dr. Johnson noted that the petitioner's I.Q. scores on the tests that she and Dr. Angelillo administered were similar and fell within the borderline range. Dr. Johnson stated, "My guess is that his true I.Q. falls somewhere between 71 and 77. But my conclusion is that his cognitive functioning falls within the borderline range."

Dr. Johnson testified that to be intellectually disabled pursuant to the DSM-IV, the person must demonstrate significantly subaverage general intellectual functioning through an individually administered I.Q. test score that falls approximately two standard deviations below the mean. Dr. Johnson noted that the petitioner had been administered a wide variety of tests, two of which were administered individually and showed him functioning roughly within the average range. Although the petitioner was administered only four subtests on one of the I.Q. tests, Dr. Johnson believed the results were "informative" as they demonstrated that when the petitioner interacted with someone individually, he scored within the average range on some skills. Dr. Johnson also believed that the best estimates of the petitioner's I.Q. were from the tests administered by her and Dr. Angelillo, both of which resulted in scores that fell within the borderline range of intelligence.

Dr. Johnson explained that a person's I.Q. does not change significantly during his or her lifetime. While some people who are placed in a very rich environment can show some gains on I.Q. tests, Dr. Johnson expected that the petitioner's I.Q. functioning would remain roughly the same throughout his life because he was not placed into any specifically enriching environments. Dr. Johnson acknowledged that a person's I.Q. scores could decrease if placed in a very deprived environment.

In examining the petitioner's adaptive functioning, Dr. Johnson acknowledged that

the results from the ABAS-II likely were limited because they were based upon the petitioner's self-rating. Dr. Johnson, however, also considered those portions of the petitioner's background that were relevant to his adaptive functioning. She conducted interviews regarding the petitioner's specific adaptive skills. Records from Riverbend showed that the petitioner had a GED, had been approved to be a legal advisor to other inmates after taking a legal test, and had received training in air conditioning and refrigeration. The petitioner was also self-employed in air conditioning and refrigeration for a period of time.

Dr. Johnson said that like anyone with borderline intellectual functioning, the petitioner had some problems in functioning. Dr. Johnson explained that those with borderline intellectual functioning often cannot read or write well and have mild problems with comprehension. They also may have difficulty with numbers and likely are not able to balance a checkbook. In their work, they may make more errors and may need closer supervision than a person with average intellectual functioning. Those with borderline intellectual functioning often perform well in low skill jobs. Dr. Johnson concluded that the petitioner's adaptive functioning was consistent with the functioning of those with borderline intellectual functioning. She determined that the petitioner did not exhibit the significant deficits in adaptive functioning necessary for a classification of intellectual disability. Rather, Dr. Johnson concluded that the petitioner's adaptive functioning was in the average to low average range.

Dr. Johnson noted that the last consideration in determining intellectual disability was whether the onset of the intellectual functioning deficits and adaptive functioning deficits occurred before the age of eighteen. Dr. Johnson said that other than the I.Q. score of 67 on the group administered I.Q. test, evidence during the petitioner's developmental period was limited. She also said that not only did issues regarding the reliability of the group administered I.Q. tests exist but that the petitioner was not "enthralled" by school in the first place and likely was not motivated to perform well on the test. Dr. Johnson noted the petitioner's low scores in achievement testing indicated academic deficits. She could not determine whether those academic deficits translated into functional academic deficits prior to the age of eighteen. Dr. Johnson said functional academic deficits related to the person's application of the things learned in school to daily life. Dr. Johnson did not believe that any compelling evidence existed establishing that any intellectual and adaptive deficits arose during the petitioner's developmental period.

On cross-examination, Dr. Johnson admitted that she had no knowledge of the environment in which the Lorge Thorndike test was administered to the petitioner in 1955 when he was twelve years old. She explained, however, that group administered tests generally are administered in a group setting and are designed to be a quick screening test

of a person's I.Q. Dr. Johnson further explained that the test was administered to the petitioner who, according to his own report and his grades, was not very motivated to perform well in school. She believed that the petitioner likely was not motivated to perform well on the group administered I.Q. test. Dr. Johnson acknowledged, "I don't know whether he was properly motivated, whether he was paying attention. I just don't know." She said that at the time, the petitioner may have met the criteria for intellectual disability. Dr. Johnson explained that the petitioner's grades suggested that he was not adequately motivated in school. She said that the I.Q. score of 67 that the petitioner received on the Lorge Thorndike test was artificially low when considered along with his score of 94 on the Peabody Picture Vocabulary Test in 1986 when he was forty-three years old.

Dr. Johnson was not aware of the standard deviation for the Lorge Thorndike test. She agreed that I.Q. tests are normed and standardized to a mean of 100 with a standard deviation of 15. She assumed that this was the case with the Lorge Thorndike test, but she was unsure. Dr. Johnson said that the petitioner's score of 91 on the WAIS was informative in regard to the petitioner's skills in the areas that were tested but that the score could not be considered as a full scale I.Q. score.

Dr. Johnson noted in her report that she did not have any direct records of the testing discussed in Dr. Cozza's affidavit. She said it was always more helpful to examine the actual report completed by the testing psychologist because it includes some level of detail. Dr. Johnson examined the petitioner's I.Q. scores in an attempt to determine the cause of the wide variety of I.Q. scores that the petitioner had obtained over the course of his life.

Dr. Johnson said that the Peabody Picture Vocabulary Test, which was administered to the petitioner in 1986 when he was forty-three years old, involves showing the subject a series of pictures, usually four at a time. The examiner then provides the person with a term and instructs the person to choose the picture that shows that term. Dr. Johnson stated that the test does not measure a person's full-scale I.Q. but correlates more with a person's verbal I.Q. She further stated that while the test is referred to as an I.Q. test, the results of the test are not as reliable as the WAIS.

Dr. Johnson testified that she administered the I.Q. test to the petitioner individually and in a "[g]enerally appropriate" environment. Dr. Johnson did not consider the conditions in which the test was administered to be ideal. There were some loud noises and knocking on the walls by other inmates at times during the test. Dr. Johnson believed that the petitioner was not quite as motivated for her as he was for Dr. Angelillo but stated that her belief was based upon speculation.

Dr. Johnson said that she administered the TOMM to determine whether the petitioner

was giving adequate effort and that the results indicated that he was exhibiting adequate effort. Dr. Johnson noticed that the petitioner did not appear to be completing the timed questions quickly. She explained that the results of the TOMM did not demonstrate whether the petitioner performed as well as he could perform on the I.Q. test. She further explained that the TOMM is "not a test of whether you're exhibiting the best effort you can, but it looks at whether or not you are deliberately exhibiting low effort."

Dr. Johnson was aware of the Flynn Effect as a concept that exists in the area of death penalty litigation. She had reviewed the Tennessee Supreme Court's decision in *Coleman v. State.*[1] She understood that the court in *Coleman* concluded that psychologists should be allowed to use clinical judgment in terms of interpreting a petitioner's I.Q. Dr. Johnson was aware that testimony had been presented in that case regarding the Flynn Effect and that the court had remanded the case to the trial court for a new hearing. She said the court also invited the State to present experts concerning the issue.

To determine adaptive deficits, Dr. Johnson administered the ABAS-II, which is generally given to the person who is the subject of the evaluation. Dr. Johnson explained that it is recommended that the test be administered to more than one respondent but that she did not know of anyone who had sufficient knowledge of the petitioner to complete the test. Dr. Johnson stated that administering the ABAS-II only to the petitioner and no one else with knowledge of the petitioner was an acceptable practice. She also interviewed the petitioner regarding certain adaptive skills and said that her questions were based upon the information about which the ABAS-II was designed to obtain. Dr. Johnson said she did not use the Vineland test to measure adaptive skills because the Vineland test cannot be administered to the individual who is the subject of the evaluation.

Dr. Johnson explained that the ABAS-II required that the petitioner rate himself on his adaptive skills. Through the test, information is obtained regarding the person's current functioning. Dr. Johnson said that by the way the questions are phrased, the person also can examine past adaptive skills. She interviewed the petitioner regarding both his present and his past life. Some of the questions in the ABAS-II related to activities that the petitioner had not done while incarcerated, such as completing business forms. Rather, when he was not incarcerated, the petitioner completed job applications and forms when working with other repairmen.

Dr. Johnson acknowledged that the purpose of the ABAS-II was to determine whether the subject presently had adaptive deficits. She further acknowledged that the petitioner had spent twenty-five years on death row in a structured environment. Dr. Johnson stated that

---

[1] 341 S.W.3d 221 (Tenn. 2011).

if she did not feel that she could have offered an opinion regarding the petitioner's adaptive functioning, she would not have done so.

Dr. Johnson testified that those who are intellectually disabled often tend to mask their deficiencies. She explained that they may function in society by relying upon "benefactors" to assist them in managing their money or completing forms. They rely upon others to perform many of the tasks required to function in society on a daily basis. As a result, they appear more competent than they actually are. Dr. Johnson said she asked the petitioner to tell the time because many of those who are intellectually disabled cannot tell time on an analog watch.

Dr. Johnson acknowledged that some of the petitioner's statements to her may not have been accurate and that she had to rely upon the petitioner's statements regarding his ability to perform certain jobs and complete certain tasks. Dr. Johnson noted that some records supported the petitioner's claims that he performed air conditioning and refrigeration services. The petitioner's data entry job involved some typing. He was required to type his name and correctly enter numbers. Dr. Johnson believed that the petitioner had been imprisoned for some time before taking the legal test to become an inmate legal advisor.

Dr. Johnson stated that her conclusion was not that the petitioner had no deficits. She explained that those functioning in the borderline range of intelligence generally have some deficits but that the deficits do not reach the level of "significant adaptive deficits" as discussed in the DSM-IV. She clarified that her conclusion was not that the petitioner had "perfect adaptive functioning," because she believes that he had limited intelligence.

Dr. Johnson testified that a long criminal history is not indicative of a person's having an adaptive deficit and that she is unsure whether criminal behavior itself represents an adaptive deficit. While Dr. Johnson acknowledged that the AAIDD mentions following rules and the law, she did not agree that a long criminal history is indicative of an adaptive deficit as it relates to intellectual disability. Rather, she testified that the issue still is being debated among those who have examined such issues and have performed forensic evaluations.

## POST-CONVICTION COURT'S FINDINGS

Following the evidentiary hearing, the post-conviction court entered an order denying the petitioner relief. The post-conviction court concluded that the petitioner failed to establish that he met the standard for intellectual disability as provided in Tennessee Code Annotated section 39-13-203.

The post-conviction court found that the petitioner did not have a functional I.Q. of

70 or below. The court summarized the intelligence testing administered to the petitioner over the course of his life in a chart as follows:

| Testing Measure | Petitioner's Age at the Time of Testing | Score |
|---|---|---|
| Lorge Thorndike | 12.7 years old | 67 |
| Beta | Unknown (likely given at age 18 or older) | 73 |
| 4 subtests of the WAIS | Approximately 38 years old | 91 |
| GATB | Approximately 38 years old | 70 |
| Peabody Picture Vocabulary | Approximately 43 years old | 94 |
| WAIS-IV administered by Dr. Angelillo | 67 years old | 77 |
| WAIS-IV administered by Dr. Johnson | 68 years old | 71 |

The post-conviction court declined to consider the results from the Lorge Thorndike and Beta tests, citing testimony that the tests were administered in a group setting and, therefore, were not suitable testing measures for determining intellectual functioning. The court noted that the Peabody Picture Vocabulary is also an I.Q. screening measure that may not be used as a valid measure of a person's full scale I.Q. The court also declined to consider the results of the four subtests of the WAIS, noting that both doctors agreed that the administration of only a portion of the WAIS is not standard practice and would not establish a valid measure of a person's I.Q. The court did not consider the results from the GATB in light of Dr. Johnson's testimony that the test traditionally was not used to establish I.Q. but to establish vocational suitability. The court found that the only valid I.Q. test scores available were the results of the WAIS-IV administered by both Dr. Angelillo and Dr. Johnson.

The court noted that Dr. Angelillo adjusted the petitioner's score of 77 on the WAIS-IV after he considered the standard error of measurement and the Flynn Effect. Dr. Angelillo, however, acknowledged that he was unaware that the American Psychological Association and the AAIDD do not accept the Flynn Effect. The court noted Dr. Angelillo's testimony that absent application of the Flynn Effect, the petitioner's I.Q. was between 72 and 82. Dr. Johnson did not apply the Flynn Effect to her testing that resulted in an I.Q. score of 71 and explained that the Flynn Effect had not been accepted by the psychological

community. The post-conviction court declined to apply the Flynn Effect, finding that the application of the Flynn Effect is not a generally accepted standard practice in the psychological community. The court, however, considered the standard error of measurement as an adjustment to the petitioner's I.Q. scores from the WAIS-IV administered by each doctor.

The post-conviction court applied the standard error of measurement to the petitioner's I.Q. score on the WAIS-IV administered by Dr. Johnson and found the range to be between 66 and 76. The court, however, noted Dr. Johnson's testimony that based upon her evaluation of the petitioner, his intellectual functioning did not fall below the borderline range. The court concluded that "[w]hen evaluated in conjunction with the score obtained by Dr. Angelillo, it would appear that petitioner's true intellectual functioning falls in the borderline range of intelligence and not the intellectually disabled range of seventy or below."

The post-conviction court also found that the petitioner failed to demonstrate that he had deficits in adaptive behavior as required by Tennessee Code Annotated section 39-13-203(a)(2). The court reviewed the testimony of both Dr. Angelillo and Dr. Johnson. The court found that even if it accepted Dr. Angelillo's assertion that the petitioner's criminal history provides sufficient evidence of adaptive deficits in social skills, the petitioner did not have additional deficits in adaptive behavior.

The court specifically found that the petitioner failed to establish that he had deficits in functional academic skills or work. The court noted that the petitioner had acquired vocational training, applied his training to the running his own business, and described to Dr. Johnson how he ran his own business and applied his training. The court also noted that while the petitioner's grades and achievement testing indicated that he "struggled in the traditional academic setting," the petitioner's ability to apply what he learned to his daily living did not appear to be impaired. The court found that the petitioner's ability to function on the job, show up for work, perform the assigned tasks, and maintain employment did not appear to be impaired. The court also found that at the time of the commission of the offense, the petitioner was able "to cope with common life demands and live independently."

After finding that the petitioner failed to meet the first two prongs of Tennessee Code Annotated section 39-13-203(a), the post-conviction court declined to address the third prong, whether the intellectual disability manifested during the developmental period or by age eighteen. The court concluded that the petitioner failed to meet the criteria for intellectual disability and denied his request for relief. This appeal followed.

## ANALYSIS

In 1990, Tennessee Code Annotated section 39-13-203 was enacted, prohibiting the execution of defendants who were intellectually disabled at the time that they committed first degree murder. *See* Tenn. Code Ann. § 39-13-203(b); *State v. Howell*, 151 S.W.3d 450, 455 (Tenn. 2004); *Van Tran*, 66 S.W.3d at 798-99. Although the statute was not intended to be applied retroactively, the execution of intellectually disabled individuals violates constitutional prohibitions against cruel and unusual punishment. *Howell*, 151 S.W.3d at 455 (citing *Van Tran*, 66 S.W.3d at 798-99); *see Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

"Intellectual disability" rendering a defendant ineligible for the death penalty requires:

(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligent quotient (I.Q.) of seventy (70) or below;
(2) Deficits in adaptive behavior; and
(3) The intellectual disability must have manifested during the developmental period, or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203(a). All three prongs must be satisfied to establish intellectual disability.

The petitioner has the burden of establishing intellectual disability by a preponderance of the evidence. *See* Tenn. Code Ann. § 39-13-203(c); *Howell*, 151 S.W.3d at 465. A preponderance of the evidence is "evidence which is of greater weight, or is more convincing, than the evidence offered in opposition." *Perry Anthony Cribs v. State*, No. W2006-01381-CCA-R3-PD, 2009 Tenn. Crim. App. LEXIS 524, at *103 (Tenn. Crim. App., at Jackson, July 1, 2009), *perm. app. denied* (Tenn. Dec. 21, 2009) (citing 32A C.J.S. Evidence 1312 (2005)).

The issue of whether a defendant is intellectually disabled and, thus, ineligible for the death penalty is a mixed question of law and fact. *Michael Wayne Howell v. State*, No. W2009-02426-CCA-R3-PD, 2011 Tenn. Crim. App. LEXIS 447, at *35 (Tenn. Crim. App., at Jackson, June 14, 2011), *perm. app. denied* (Tenn. Jan. 9, 2013). We review the post-conviction court's findings of fact de novo, with a presumption of correctness that is overcome only if the preponderance of the evidence is contrary to the post-conviction court's findings. *See Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). This court conducts a purely de novo review of the application of the law to the facts with no presumption of correctness attaching to the post-conviction court's conclusions of law. *Id.* at 457.

## A. Tenn. Code Ann. § 39-13-203(a)(1)

To be intellectually disabled, Tennessee Code Annotated section 39-13-203(a)(1)

requires "[s]ignificantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below." In *Howell v. State*, the Tennessee Supreme Court held that the demarcation of an I.Q. score of 70 was a "bright-line" rule that must be met. *Howell*, 151 S.W.3d at 456-59. The court also held that the statutory provision should not be interpreted to allow for a standard error of measurement or any other circumstance whereby an individual with an I.Q. above 70 could be considered intellectually disabled. *Id.* at 457-58.

On April 11, 2011, before the evidentiary hearing in the present case, the Tennessee Supreme Court released its opinion in *Coleman v. State*, holding that although an individual's I.Q. generally is obtained through standardized intelligence tests, section 39-13-203 does not provide clear direction regarding how an individual's I.Q. should be determined and does not specify any particular test or testing method that should be utilized. *Coleman v. State*, 341 S.W.3d 221, 241 (Tenn. 2011). The court noted that section 39-13-203(a)(1) requires a "functional intelligence quotient of seventy (70) or below" and does not require a "functional intelligence quotient *test score* of seventy (70) or below." *Id.* (emphasis in original). Therefore, "the trial courts may receive and consider any relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below." *Id.*

The court noted that section 39-13-203(a)(1) differs with clinical practice in one material respect. *Id.* at 247. In diagnosing intellectual disability, clinicians generally report their conclusions regarding an individual's I.Q. within a range, and section 39-13-201(a)(1) requires more definite testimony. *Id.* As a result, "an expert's opinion regarding a criminal defendant's I.Q. cannot be expressed within a range (i.e., that the defendant's I.Q. falls somewhere between 65 to 75) but must be expressed specifically (i.e., that the defendant's I.Q. is 75 or is 'seventy (70) or below' or is above 70)." *Id.* at 242.

Experts may utilize relevant and reliable practices, methods, standards, and data in formulating their opinions. *Id.* Moreover,

> if the trial court determines that professionals who assess a person's I.Q. customarily consider a particular test's standard error of measurement, the Flynn Effect, the practice effect, or other factors affecting the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q., an expert should be permitted to base his or her assessment of the defendant's "functional intelligence quotient" on a consideration of those factors.

*Id.* at n.55. The emphasis to be placed upon clinical judgment varies depending upon "the

type and amount of information available, the complexity of the issue, and the presence of ore or more challenging conditions or situations." *Id.* at 246. The trial court is not required to follow any particular expert's opinion but must fully and fairly consider all evidence presented, including the results of all I.Q. tests administered to the defendant. *Id.* at 242.

Therefore, pursuant to *Coleman*, "a trial court may accept the opinion of an expert that a defendant's I.Q. is 70 or below based upon the application of the Flynn Effect even though the defendant received an I.Q. score of 75 on the applicable test." *Michael Wayne Howell*, 2011 Tenn. Crim. App. LEXIS 447, at *39. The application of the Flynn Effect or the standard error of measurement, however, is not required. *Coleman*, 341 S.W.3d at 242 n.55; *Michael Wayne Howell*, 2011 Tenn. Crim. App. LEXIS 447, at *39. As a result, a trial court "may reject the application of the Flynn Effect to adjust I.Q. scores based upon evidence of its lack of validity and consider the I.Q. score of 75 as the defendant's functional I.Q." *Michael Wayne Howell*, 2011 Tenn. Crim. App. LEXIS 447, at *39.

The petitioner contends that the post-conviction court erred in refusing to apply the Flynn Effect, in weighing the results of the I.Q. tests, and in rejecting Dr. Angelillo's testimony that the petitioner's I.Q. fell within the intellectually disabled range. In declining to apply the Flynn Effect to adjust the petitioner's I.Q. scores downward, the post-conviction court considered evidence that applying the Flynn Effect is not a generally accepted practice in the psychological community. The APA and the AAIDD have not accepted the application of the Flynn Effect. Dr. Angelillo stated he only applied the Flynn Effect in capital litigation and did not apply it in his general practice. The post-conviction court's findings are not contrary to the holding in *Coleman*, and the court did not err in rejecting the application of the Flynn Effect.

With regard to the post-conviction court's weighing of the results of the I.Q. tests, we note that Tennessee Code Annotated section 39-13-203 does not direct which particular test or testing method be used in assessing a defendant's intellectual functioning. *Howell*, 151 S.W.3d at 459. "A court may certainly give more weight to one test[] but should do so only after fully analyzing and considering all evidence presented." *Id.* The post-conviction court reviewed the results of each I.Q. test and the circumstances under which each test was administered.

Dr. Johnson testified that the DSM-IV requires that the determination of significantly subaverage intellectual functioning be based on consideration of an individually administered I.Q. test. The post-conviction court declined to consider the results of the Lorge Thorndike and the Beta tests because they are group administered tests and, therefore, were not suitable testing measures for determining intellectual functioning. The court found that the results of the Peabody Picture Vocabulary were not a valid measure of the petitioner's full-scale I.Q.

because the test is an I.Q. screening measure. The court rejected the results of the GATB in light of Dr. Johnson's testimony that the test was used to measure vocational suitability and not I.Q. The court also rejected the petitioner's results from the four subtests of the WAIS based upon the testimony of both Dr. Angelillo and Dr. Johnson that the administration of a portion of the WAIS is not standard practice and would not establish a valid measure of an individual's I.Q. Rather, the post-conviction court found that the only valid I.Q. test scores available were the results of the WAIS-IV administered by both Dr. Angelillo and Dr. Johnson. The evidence does not preponderate against the post-conviction court's findings.

The post-conviction court applied the standard error of measurement to the petitioner's I.Q. scores on each of the WAIS-IV tests. Even though Dr. Angelillo testified that the petitioner's intellectual functioning was in the intellectually disabled range, he also testified that absent application of the Flynn Effect, the Petitioner's I.Q. was between 72 and 82. The post-conviction court found that when the standard error of measurement was applied to the petitioner's I.Q. score of 71 on the WAIS-IV administered by Dr. Johnson, the I.Q. range was between 66 and 76. The post-conviction court, however, accredited Dr. Johnson's testimony that the petitioner's functional intelligence was within the borderline range. Dr. Johnson's opinion was based upon her testing of the petitioner, her interview of the petitioner, her review of the petitioner's records, and her interviews of prison personnel.

The petitioner argues that Dr. Angelillo's conclusion that he is intellectually disabled is more credible. However, we generally defer to a post-conviction court's findings with respect to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). The post-conviction court considered all of the evidence presented at the hearing and accredited Dr. Johnson's testimony that the petitioner's intellectual functioning fell within the borderline range. The evidence does not preponderate against the post-conviction court's findings. Therefore, we conclude that the petitioner failed to establish by a preponderance of the evidence that he had "[s]ignificantly subaverage general intellectual functioning" as evidenced by an I.Q. of 70 or below. *See* Tenn. Code Ann. § 39-13-203(a)(1).

## B. Tenn. Code Ann. § 39-13-203(a)(2)

The second prong of intellectual disability in Tennessee Code Annotated section 39-13-203(a)(3) requires "[d]eficits in adaptive behavior." Adaptive functioning relates to a person's effectiveness in coping with common life demands and the person's ability to meet the standards of personal independence expected of someone in his or her particular age group, socio-cultural background, and community setting. *Van Tran*, 66 S.W.3d at 795 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 40 (4th ed. 1994)).

While the Tennessee Supreme Court has not adopted the clinical definition of "[d]eficits in adaptive behavior," the court has stated that deficits in adaptive behavior "'mean[s] the inability of an individual to behave so as to adapt to the surrounding circumstances.'" *Coleman*, 341 S.W.3d at 248 (quoting *State v. Smith*, 893 S.W.2d 901, 918 (Tenn. 1994)). In determining whether the second prong has been satisfied, Tennessee courts have relied upon expert testimony of adaptive behavior or functioning based upon definitions advanced within the relevant medical and psychological community and authoritative manuals such as the AAIDD Manual and the DSM-IV. *See id.* (citing cases). Our supreme court drew upon the DSM-IV and stated that an individual who is intellectually disabled will have significant limitations in at least two of the following basic skills: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Van Tran*, 66 S.W.3d at 795 (citation omitted); *see also Coleman*, 341 S.W.3d at 248. Influences on adaptive functioning may include the individual's "education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with [intellectual disability]." *Van Tran*, 66 S.W.3d at 795 (citation omitted); *see also Coleman*, 341 S.W.3d at 248.

The petitioner asserts that the post-conviction court erred in failing to accredit Dr. Angelillo's testimony that the petitioner had deficits in adaptive behavior in the areas of functional academic skills, work, and social skills. Dr. Angelillo based his opinion that the petitioner had deficits in social skills upon the petitioner's criminal history. The post-conviction court found that even if it accepted Dr. Angelillo's testimony that the petitioner's criminal history was sufficient evidence of deficits in social skills, the petitioner failed to meet the second prong of intellectual disability in Tennessee Code Annotated section 39-13-203(a)(2) in that he failed to show that he had deficits in at least two of the skill categories set forth in the diagnostic criteria. The court specifically found that the petitioner failed to establish that he had deficits in functional academic skills and work.

Dr. Angelillo testified that due to the amount of time that had passed since the offense occurred, he had difficulty rendering an opinion regarding whether the petitioner had any deficits in adaptive behavior. We also have recognized that forensic assessments of adaptive deficits are more difficult than clinical assessments due, in part, to the fact that the mental health expert must perform a retrospective diagnosis under less than optimal circumstances. *Michael Wayne Howell*, 2011 Tenn. Crim. App. LEXIS 447, at **48-49. Dr. Angelillo's opinion regarding the petitioner's deficits was based upon his review of the records that he was provided. He acknowledged that he could not state that his opinions were based upon "rock solid information." While Dr. Angelillo stated that the petitioner had adaptive deficits in the area of work, he noted the difficulty in evaluating the petitioner's work deficits due to conflicting reports regarding his work history. Dr. Angelillo also stated that his opinion

regarding the petitioner's functional academic deficits was based upon "[s]peculation."

Dr. Johnson, however, based her opinion that the petitioner did not have adaptive deficits in the areas of work and functional academic skills upon her review of the petitioner's records, her testing of the petitioner, and her interviews of the petitioner and jail personnel. Dr. Johnson administered the ABAS-II to the petitioner to examine how he viewed his own adaptive functioning. While administering the test to another person, in addition to the petitioner, with knowledge of the petitioner's functioning was recommended, Dr. Johnson was unaware of anyone with the level of detail and knowledge regarding the petitioner necessary to complete the test. Dr. Johnson said her administration of the ABAS-II to the petitioner by himself was an acceptable practice. She also interviewed the petitioner regarding his adaptive skills. Her questions, as well as some of the questions in the ABAS-II, related to the petitioner's adaptive functioning prior to his incarceration for the present offense.

Although the petitioner's grades and achievement test scores were low, he told Dr. Johnson that he was not interested in school. The petitioner later obtained his GED and received training in air conditioning and refrigeration repair. Moreover, as both Dr. Johnson and Dr. Angelillo testified, the category of "functional" academic skills relates to how a person applies what he or she has learned to the person's daily life. The petitioner was able to apply his training to operate his own air conditioning and refrigeration repair business. He described to Dr. Johnson how he ran his business and scheduled appointments, the tasks that he completed, and the measurements that he made. The petitioner maintained a bank account during the first few months in which he operated his business. He used a map to find his way to different appointments. He could order from a menu, use a telephone directory to locate a telephone number, add and subtract fairly well, read, manage his money, cook, care for his daughter, and live independently. Dr. Johnson listed other examples of the petitioner's ability to apply what he had learned in his daily life. This evidence supports the post-conviction court's conclusion that the petitioner failed to establish that he had adaptive deficits in functional academic skills.

With regard to the petitioner's work history, we note that the petitioner held several jobs prior to his incarceration for the present offense. Prior to the commission of the offense in February of 1985, the petitioner maintained an air conditioning and refrigeration repair business from 1978 to 1985. The petitioner described to Dr. Johnson in detail the tasks that he was required to complete in maintaining the business. Dr. Johnson testified that the petitioner was required to exhibit organizational skills to maintain the business. The petitioner also held jobs as a cook, a bartender, and a fork lift operator prior to his incarceration for the present offense. Dr. Johnson noted that bartending required some memory skills. This evidence supports the post-conviction court's finding that the petitioner

failed to established that he had adaptive deficits in the area of work.  Because the petitioner failed to establish at least two deficits in adaptive behavior, he is not entitled to relief with regard to this issue.

### C.  Tenn. Code Ann. § 39-13-203(a)(3)

The third prong of intellectual disability in Tennessee Code Annotated section 39-13-203(a)(3) requires that the intellectual disability manifest "during the developmental period, or by eighteen (18) years of age."  Both the significantly subaverage intellectual functioning and deficits in adaptive behavior must have manifested by the age of eighteen.  *State v. Strode*, 232 S.W.3d 1, 16 (Tenn. 2007).  Because we have concluded that the petitioner failed to meet the first two prongs of section 39-13-203(a), we need not reach this issue.

### CONCLUSION

We conclude that the petitioner failed to establish the criteria for intellectual disability in Tennessee Code Annotated section 39-13-203(a).  Therefore, the judgment of the post-conviction court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE